FEDERAL FINANCE COMPANY, APPELLANT, V. BAXTER CASS ET AL., APPELLEES.

FILED MARCH 20, 1931. No. 27203.

*Drake & Drake,* for appellant.

*N. M. York, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD and DAY, JJ., and JAMES and WRIGHT, District Judges.

JAMES, District Judge.

This is a suit in equity commenced by the Federal Finance Company, a corporation, appellant, hereinafter referred to as the plaintiff, against Baxter Cass and Mabel Cass, husband and wife, appellees, hereinafter referred to as defendants. Plaintiff has its office in Kearney, Nebraska. The defendants reside at Tabor, Iowa. The object of the suit is to foreclose a real estate mortgage. The

mortgage was given by the defendants to the plaintiff upon real property belonging to Baxter Cass and located in McPherson county, Nebraska. Both note and mortgage bear date of November 29, 1926, the note maturing November 25, 1927. The mortgage is for the sum of $525. The petition of plaintiff is in the usual form for suits foreclosing real estate mortgages. The defendants' amended answer admits the execution and delivery of the note and mortgage as set out in plaintiff's petition, but denies all other allegations. Defendants then pleaded as a defense to the mortgage that the plaintiff procured the execution and delivery thereof by fraud and false representations made to the defendants. Plaintiff represented to the defendants that their son, Wayne Cass, was charged with having obtained from one Frank W. Thomas two automobiles, of the total value of $1,400, by false representations. A criminal charge had been filed against Wayne, and he was at that time out on bond. Plaintiff further represented that Wayne Cass was very much in need of financial assistance in order to prevent his prosecution for issuing a no-fund check for the cars which he had purchased. Plaintiff further represented that if the defendants would execute to the plaintiff a note and mortgage for the sum of $525 plaintiff would then advance the sum of $500 to Frank W. Thomas, the man from whom Wayne had purchased the cars, which sum would aid in effecting a settlement and relieve the son from further prosecution. The defendants, with a view to preventing the prosecution of their son under said criminal charges and believing and relying upon said representations and promises made by plaintiff, executed and delivered the note and mortgage to plaintiff. Plaintiff caused this mortgage to be recorded and it is the mortgage at issue in this case. Defendants charge that plaintiff, in violation of the agreement, kept and appropriated said note and mortgage to its own use, and did not pay the said Frank W. Thomas the $500 or any other sum, and that neither Thomas, the defendants, nor either of them, ever received any credit for the amount of said

mortgage. They further state that said mortgage was tainted with usury.

The district court by its decree canceled the note and mortgage, quieted the title in Baxter Cass and dismissed plaintiff's cause of action.

The evidence introduced at the trial tends to establish the following facts, over which there is but little, if any, dispute: On November 5, 1926, plaintiff wrote a letter to B. B. Cass, at Tabor, Iowa, in which he recited the transaction relative to Wayne Cass purchasing the two cars; stating that the son had undertaken to pay for the cars by giving a no-fund check for $1,400; that the son had then come to plaintiff to procure a loan. Plaintiff made the loan, taking a mortgage on the cars purchased as security, but the son, instead of using the money for the purpose of taking care of the no-fund check, used it for other purposes; that in case of a showdown the plaintiff could step in and take all the cars that it had loans on and which Wayne had sold, and thereby protect itself, but that there would still be the criminal liability, and that they did not want to take such action; that Wayne was now at the end of his string and must raise the money to take care of this check and perhaps a little more immediately. In answer to this letter the defendant, B. B. Cass, wrote that he was not in shape to help his son at the present time, and asked them to give the son a chance and be as lenient with him as they could. On November 26, 1926, the plaintiff again wrote the defendant a letter, addressed to Tabor, Iowa, in which he again gives a history of the case, and asks that the defendants put up a mortgage on the half section of land they owned near Gandy for the sum of $1,050, which it was believed would clear the charge in connection with the check given for the cars, in the total amount of $1,488; Thomas would accept that amount, and that the principal thing which was now pressing the son was the check which could now be settled for $1,000, and with that and an amount to settle some more outstanding accounts Wayne would be able to go back to work as well as being relieved of criminal charges being filed against him. The letter said:

"I believe that if you can possibly raise the $500 in cash to be applied on the Lexington account, it should be done, but it would have to be done before the 3d of December as his hearing is set on that date, and the man who has filed the charges is just the type that would sooner lose the money and see Wayne spend time in the pen than to be lenient in any manner."

Plaintiff inclosed to defendants a mortgage covering the property and a note for the sum of $1,050, $50 being for commission for making the loan, and the balance of $1,000 to prevent the prosecution. Defendants refused to execute or deliver any mortgage on the entire half section of land, claiming that the father was an old man and unable to take care of such matters. After plaintiff had ·failed in procuring the execution of the $1,050 mortgage, it prepared the mortgage in controversy and sent to the defendants for execution. This was plaintiff's third effort, and after reducing the amount from $1,400 to $525 it was successful in having a mortgage signed by defendants. This $525 mortgage was placed on the quarter section owned by the father.

Up to this point there is no conflict in the evidence as to what took place. Wayne, the son, was in trouble, having purchased the cars and given in payment thereof a nofund check; was later arrested and then prosecuted. Defendants were approached and solicited by plaintiff to raise some money or make a mortgage to plaintiff, so that plaintiff might stop the prosecution of the defendants'· son. From the evidence it appears that plaintiff procured a bond for the son, but afterwards surrendered him to the authorities and he was placed in jail. The son was finally taken before the court and pleaded guilty to the charge, but instead of being sentenced was paroled. Of the $525 represented by the mortgage, none of it was ever paid to Frank W. Thomas, the man who was prosecuting Wayne, but was paid out as follows: $100 check executed by plaintiff and made payable to Wayne Cass; check for $200, executed by plaintiff and made payable to James T. Keefe; check for $95, made payable to the Central National Bank of Kearney, Nebraska; check for $105, payable to the order of

Wayne Cass, the balance of $25 being retained by plaintiff.

The defendant, B. B. Cass, took the witness-stand in his own behalf and, so far as material in establishing fraud, testified as follows:

"Q. What do you remember about that mortgage, how it was explained to you, about what it was for? A. Well, my son was in trouble and there had to be something done. It referred to this Frank Thomas deal, told me about the deal, about the $1,400. That isn't the words that was said in the letter, but that was the substance of the matter, that he was in trouble and wanted help. * * * Q. What did you do pursuant to that letter? Did you execute a note and mortgage? A. No; I didn't execute it; they executed it and sent it to me. Q. They drew it and sent it to you for execution? A. Yes, sir. Q. What did you do? A. I remailed it back to them, or sent it by—I would rather think I sent it by mail. Q. How does it come to be in your possession now? A. They sent it back to me; also, sent the $525 mortgage." It appears from the evidence there was a letter accompanying this $525 note and mortgage, but it has been lost. "Q. What were you signing it for? A. To help out on this Frank Thomas deal. Q. What did they say to you in the letter? A. They said it was for that purpose. Q. How did you come to sign the $525 note and mortgage? A. I signed it for the purpose of helping out on this $1,400 Thomas deal."

The transactions relative to the boy being in trouble, the purchase of the cars, giving in payment a no-fund check, charged with a criminal offense and being arrested, were all true, and the representations as set out in the letters are not denied by any of the parties.

There is no conflict in the evidence as to what use was made of the $525. None of it went to Frank W. Thomas. Representations were made by plaintiff to defendants "that, if you can possibly raise the $500 in cash to be applied on the Lexington account, it should be done, but it would have to be done before the 3d of December as his hearing is on that date." The Lexington account was the Thomas account. The father and mother were anxious to save their son from the penitentiary. That was the moving

cause and the only purpose for which they executed the note and mortgage in controversy. They would not have signed the note and mortgage for any other purpose. They were led to believe, and did believe, it was for that one purpose only.

The principal question is: Did plaintiff deceive defendants and by such deception procure the note and mortgage and use the proceeds for another purpose than that promised? There can, under the evidence in this case, be but one answer, and that is that it did. It is true, as a general rule, that fraud must be based upon an existing fact and cannot be based upon a promise to perform something in the future unless the intention to defraud existed at the time the promise was made. This court has on such a proposition held:

"Ordinarily, a false promise upon which fraud may be predicated must be of an existing fact or a fact alleged at the time to exist, and cannot consist of a mere promise to be performed in the future; but if the intention not to perform the promise be shown to have existed at the time the promise was made, the promise is fraudulent." *Pollard v. McKenney,* 69 Neb. 742. See, also, *Cerny v. Paxton & Gallagher Co.,* 78 Neb. 134.

The fact that plaintiff expected to otherwise use the fund is shown by correspondence and telegrams had and received by plaintiff with other creditors and their representatives.

It has been held in the case of *Larmon v. Knight,* 140 Ill. 232, that the existence of evil intent at the time the promise was made may be inferred from a failure to comply with the promise, and that the promisor may be presumed to have intended when he made the promise to do what he finally did do. The *Larmon* case was cited and approved in the *Pollard* case.

Upon a full and careful consideration of all the facts and circumstances presented at the trial of this case, we are of the opinion that the decree of the district court is correct and should be and is hereby

AFFIRMED.